**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TRARMS, INC., et al.,

      Plaintiffs,

    v.                                        Case No. 16-14229

LEAPERS, INC., et al.,

      Defendants.

_____/

**OPINION AND ORDER DENYING MOTION TO TRANSFER AND GRANTING IN
PART AND DENYING IN PART MOTION TO DISMISS**

      Before the court are two motions—a motion to transfer (Dkt. # 5) and a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6) (Dkt. # 4)—both filed by

Defendants Leapers, Inc. ("Leapers") and Continental Incorporated, Inc. ("Continental").

The motions are fully briefed, and a hearing was held on May 3, 2017. For the reasons

that follow, the court will deny the motion to transfer and grant in part and deny in part

the motion to dismiss.

## I.  BACKGROUND

      Plaintiffs' amended complaint (Dkt. # 2) alleges the following, taken as true for

the purposes of this order. Plaintiff Charlie Shi is the founder and president of Plaintiff

Trarms, Inc. ("Trarms"). Shi is a Chinese national who resides in California, and Trarms

is a California corporation. Defendant Leapers is a Michigan corporation, with its

corporate office in Livonia, Michigan. Both Trarms and Leapers are in the business of

selling rifle scopes and related shooting products. Trarms sells its scopes in the United

States under the "SNIPER" registered trademark. Trarms' "SNIPER" scopes bear no markings suggesting that they are Leapers products. (Dkt. # 2.)

Leapers hired Continental, an Indiana corporation and private investigation firm located in Indianapolis, Indiana, sometime in 2013. Continental markets itself as employing "asymmetrical warfare" to protect its clients' intellectual property rights. (Dkt. # 2, Pg. ID 8.) Leapers and Continental targeted Plaintiffs and Plaintiffs' customers through a variety of means.

Most relevantly, Continental ordered scopes from Trarms and had them shipped to Indiana. Continental then approached the police department in Evansville, Indiana, approximately 180 miles from Continental's Indianapolis officers, to pursue criminal charges against Shi, his customers, and distributors, based on a unique Indiana Criminal Statute, the Indiana Crime Victim's Act, Ind. Code § 34-24-3-1. (Dkt. ## 5, 9.) Continental enjoys a "special relationship" with the Evansville authorities and prosecutor Malcolm Gwinn. (Dkt. # 2, Pg. ID 33.) Leapers and Continental provided false evidence, including false affidavits to be used to secure an arrest warrant, knowing no additional investigation would be done. (DKt. # 2, Pg. ID 13-14.)

In January of 2014, Continental engineered Shi's public arrest in front of competitors and customers at a trade show in Las Vegas, Nevada, and his subsequent extradition to Evansville, Indiana. Continental employee Brad Harper, posing as a prospective customer, arranged to meet Shi at the trade show. At the show, in front of a crowd, Harper approached Shi with "seven or eight" police officers. The officers physically detained Shi and escorted him from the show. (Dkt. # 2, Pg. ID 16-17.) Shi was extradited to Indiana and charged with counterfeiting. The criminal charges were

subsequently dismissed upon motion by Shi's defense counsel. (Dkt. # 2, Pg. ID 14-15.) Several customers of Shi were similarly arrested and prosecuted, including "Adrish Banerjee and Catherine Yan He in Nevada, Yongming (Steven) Sui in California, and Lujan Shi in Michigan." (Dkt. # 2, Pg. ID 21.)

Throughout the investigation and prosecution of Shi, prosecutor Gwinn remained in near constant contact with Continental. (Dkt. # 2, Pg. ID 31.) Gwinn received extensive factual memoranda as well as legal advice from Continental during this time. (Dkt. # 2, Pg. ID 2.)

Leapers filed a civil suit in the Southern District of Indiana against Shi and Trarms under the civil recovery provision of the Indiana Crime Victim's Act. *See Leapers, Inc. v. Trarms, Inc.*, Case No. 15-01539, (the "Indiana Litigation") Dkt. # 1 (filed September 11, 2015). The Indiana Litigation is ongoing. *See Leapers*, 203 F. Supp.3d 969 (S.D. Ind. 2016) (denying motion to dismiss).

Continental also sent letters to Trarms' customers claiming that the recipients were selling counterfeit Leapers products. The letters demanded that the recipients stop selling Trarms products, threatened civil and criminal prosecution, and demanded payment. (Dkt. # 2, Pg. ID 19.)

On June 10, 2014, Leapers filed an infringement action against several defendants, including Trarms, in the Eastern District of Michigan, alleging the unauthorized use of Leapers' trade dress. *See Leapers, Inc. v. SMTS, LLC*, Case No. 14-12290 (the "Original Civil Action"), Dkt. # 1 (filed June 10, 2014). Specifically, Leapers claimed that it had unregistered, but protected, trade dress rights in the "scalloping" pattern of grips on the various adjustable parts of its scope. *Id.*

Leapers theory in the civil case, that Trarms "SNIPER"-branded scopes were counterfeit because they copied the "scalloping" pattern on the various adjustable portions, was also its theory in the criminal prosecution of Shi. Before engineering Shi's arrest, Leapers had not attempted to register its alleged trade dress either in Indiana or with the federal Patent and Trademark Office. (Dkt. # 2, Pg. ID 14.) In fact, Shi was the original designer of the scalloping feature. (Dkt. # 2, Pg. ID 11.)

Trarms and SMTS, Inc. (d/b/a "Tuff Zone"), a Trarms customer named as a defendant, filed counterclaims against Leapers, adding Shi as a Counterclaimant and Continental as a Counter-Defendant. The counterclaimants asserted seven counterclaims: (1) fraudulent procurement of Leapers' Michigan trademark registration; (2) declaratory judgment on the issue of Leapers' trade dress registration; (3) 42 U.S.C. § 1983 claims for the arrest; (4) abuse of process and false imprisonment; (5) tortious interference with business relationship or expectancy; (6) unjust enrichment; and (7) punitive damages. *See* Original Civil Action, Dkt. # 43.

Upon stipulation of the parties, the court stayed the counterclaims, as well as the related discovery and motions, on February 26, 2015. Original Civil Action Dkt. # 57. All the defendants in the Original Civil Action jointly moved for summary judgment in April of 2015, which the court granted in March of 2016. Original Civil Action Dkt. # 109. In its summary judgment order, the court found that the "scalloping" grip design's "obvious functionality" rendered it ineligible for trade dress protection. *Id.* at Pg. ID 4787. Leapers then moved for reconsideration, Original Civil Action Dkt. # 112, which the court denied, Original Civil Action Dkt. # 119. Trarms moved for an award of attorney fees on the

basis that the case was "exceptional," which is still pending before the court. Original Civil Action Dkt. # 126.

After the court granted summary judgment, the parties submitted an agreed motion to dismiss counterclaim counts I, II, VII, and VIII without prejudice and sever the remaining, stayed, counterclaims. Original Civil Action Dkt. # 115. The stipulated motion indicated that severance would allow Leapers to immediately appeal the court's summary judgment order and the severed claims would continue as a separate proceeding "in which Judge Cleland shall likewise preside." Original Civil Action Dkt. # 115, Pg. ID 4978. The court granted the motion in a December 2, 2016 stipulated order. Original Civil Action Dkt. # 123; (*see* Dkt. # 1).

Pursuant to the severance order, Plaintiffs filed an amended complaint on December 23, 2016. (Dkt. # 2.) The amended complaint does not list Tuff Zone as a plaintiff, and the briefs treat Tuff Zone as a nonparty witness. Counsel informed the court that Tuff Zone had dropped its claims against Defendants, and the court dismissed Tuff Zone as a party in a text-only order entered April 24, 2017.

Two motions are pending: the instant motion to dismiss (Dkt. # 4) and a motion to transfer the case to the Southern District of Indiana. (Dkt. # 5). For the reasons that follow, the court will deny the motion to transfer and grant in part and deny in part the motion to dismiss.

## II.  MOTION TO TRANSFER

There is no dispute that the court has personal jurisdiction over Defendants— Defendants seek a transfer of convenience. The statute provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any district or division where it might have been brought." 28 U.S.C. § 1404(a). "As the permissive language of the transfer statute suggests, district courts have 'broad discretion' to determine when party 'convenience' or 'the interest of justice' make a transfer appropriate." *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) (quoting *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994)). The moving party bears the burden of demonstrating by a preponderance of the evidence that, "in light of these factors, 'fairness and practicality strongly favor the forum to which transfer is sought.'" *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp.2d 943, 946 (E.D. Mich. 2003) (Gadola, J.) (quoting *Thomas v. Home Depot U.S.A., Inc.*, 131 F. Supp.2d 934, 936 (E.D. Mich. 2001)).

The parties agree that courts making this determination look to a number of factors, including: (1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. (Dkt. # 5, Pg. ID 128; Dkt. # 9, Pg. ID 180.)

The convenience of the parties and non-party witnesses does not favor transfer. Both Plaintiffs are California residents. Leapers is a Michigan corporation based in Livonia, Michigan. Continental is an Indiana corporation based in Indianapolis. Transfer would serve only to shift the inconvenience from one Defendant to the other. With respect to non-party witnesses, the convenience gains of transfer are similarly mixed.

The individuals involved in the prosecution—Malcolm Gwinn, Justin Brandt, and Detective Robert Weis—all apparently reside in or around Evansville, Indiana. Plaintiff points to a few Michigan resident witnesses, namely "Lujan Shi, officers of SMTS and an investigator from Conifer Insurance." (Dkt. # 9, Pg. ID 189.)

Defendants do not specify whether they request a transfer to the Indianapolis Division or the Evansville Division of the Southern District of Indiana. In their reply brief, Defendants indicate that they believe either division would be a more convenient forum than the Eastern District of Michigan. (Dkt. # 18, Pg. ID 497 n. 2.) The distinction is significant—Indianapolis and Evansville are approximately 180 miles apart. (Dkt. # 9-7.) The Indiana Litigation is pending in the Indianapolis division, but the operative facts took place—and the nonparty witnesses reside—in the Evansville division. Even after transfer, either division involves substantial travel for either the Continental witnesses or the Evansville witnesses—though less than if transfer were not granted. This substantially undercuts any convenience gains for witnesses from transfer.

Neither does familiarity with the governing law favor transfer. As discussed below, the claims involve application of Michigan, Nevada, and Indiana law. (*See* Dkt. # 5, Pg. ID 136-37.) Any court hearing this case will be asked to apply the law of foreign states. Further, this court is more familiar with Michigan's choice of law rules, which would apply even after transfer. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). At this stage, it appears Defendants overstate the degree to which the case turns on interpreting the Indiana Crime Victim's Act, given that the allegedly defamatory letters repeatedly assert trademark and trade dress rights. (*See* Dkt. # 4-3.)

The weight afforded to the Plaintiffs' choice of forum, judicial efficiency, and the interests of justice disfavor transfer. If this action can be consolidated with the ongoing Indiana Litigation, some trial efficiency is gained. However, this court has invested substantial time into this proceeding already—years, in fact. Further, it appears that the Indiana Litigation is well into discovery. *See Leapers* 203 F. Supp.3d 969 (denying motion to dismiss). Transfer at this point would require the Indiana court to familiarize itself with extensive facts not at issue in that litigation. And given that Defendants allegedly manufactured jurisdiction in Indiana in order to proceed under an Indiana criminal statute when Plaintiffs do not ordinarily do business in Indiana, allowing transfer may encourage an unusually insidious kind of forum shopping.

The court declines to address the remaining factors at length. There does not appear to be a single "nexus" of facts here—the conduct complained of took place in Nevada, Indiana, Michigan, and California to greater or lesser degree depending on the count. Courts have found the location of documentary evidence to be only a "minor consideration" in this analysis. *See Audi AG and Volkswagen of America, Inc. v. D'Amato*, 341 F. Supp.2d 734, 751 (E.D. Mich. 2004) (Borman, J.). To the extent this court will have limited means to compel the appearance of Continental's employees and Evansville law enforcement and prosecutors, the Southern District of Indiana is similarly limited with respect to employees and officers of Leapers and, apparently, with respect to the Evansville witnesses.[1] Continental is a small company relative to the other

---

[1] Federal Rule of Civil Procedure 45(c) limits the subpoena power of federal courts to "within 100 miles of where the person [commanded to appear] resides, is employed, or regularly transacts business in person" or, for parties, party officers, and persons commanded to attend trial who would not incur substantial expenses, to "within the state where the person resides, is employed, or regularly transacts business in person." Fed.

parties, but it has substantial ties to Michigan. Its size has not prevented it from doing significant business in Michigan, and it is already roughly 180 miles away from Evansville.

Considering the weight of Plaintiffs' choice of forum, this court's familiarity with the case and governing law, efficiency, and the need to protect against forum-shopping, combined with the at-best mixed gains to convenience, the court finds that Defendants have not met their burden of showing that fairness and practicality *strongly* favor transfer. *Amphion,* 285 F. Supp.2d at 946 (emphasis added).

Plaintiffs also argue that the parties agreed to litigate these claims in Michigan. The parties' joint motion for severance provided that "Judge Cleland shall likewise preside" over the spun-off litigation. Original Civil Action, Dkt. # 115, Pg. ID 4978. The court believed that to be the parties' intent at the time, and, in its order granting the joint motion, directed the Clerk of the Court to assign the new civil action—this action—to this court's docket. (Dkt. # 1, Pg. ID 3.) Defendants simply assert that the parties' agreement did not amount to a forum selection agreement and, even if it did, it is outweighed by the other factors. (Dkt. # 18, Pg. ID 499.)

The court need not, and will not, conclusively determine whether the severance motion effectively contained a forum selection clause. Either way, Defendants have not met their burden of showing that fairness and practicality strongly favor transfer. *See Amphion*, 285 F.Supp2d at 946. The court will deny the motion accordingly.

---

R. Civ. P. 45(c)(1).

## III. MOTION TO DISMISS

Rule 12(b)(6) provides for dismissal for failure to state a claim upon which relief may be granted. Under the rule, the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pleaded factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). This standard requires more than bare assertions of legal conclusions. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001). "[A] formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Any claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

However, to survive a motion to dismiss, a complaint must provide sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "The plausibility standard is not akin to a "probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) Additionally, on a motion to dismiss, a court is usually limited to the complaint and attached exhibits, but it may also consider "public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the

claims contained therein." *Erie County v. Morton Salt*, *Inc.*, 702 F.3d 860, 863 (6th Cir. 2012) (quoting *Bassett v. Nat'l Coll. Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008)).

The amended complaint asserts eight counts:

Count I: Tortious Interference with Business Relationship or Expectancy;
Count II: Violations of the Sherman Act, 15 U.S.C. § 1, 2;
Count III: Defamation;
Count IV: False Light;
Count V: Abuse of Process;
Count VI: False Arrest and Imprisonment;
Count VII: Malicious Prosecution; and
Count VIII: 42 U.S.C. § 1983.

(Dkt. # 2.) Defendants' motion argues that each fails to state a claim or is otherwise deficiently pled. (Dkt. # 4.) The court addresses each in turn.

### A. Count I: Tortious Interference with Business Relationship or Expectancy

The parties agree, at least for the purposes of this motion, that Michigan law governs the tortious interference claim. (Dkt. # 4, Pg. ID 48; Dkt. # 13, Pg. ID 386.) Under Michigan law, the elements of tortious interference are "(i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage." *Lucas v. Monroe County*, 203 F.2d 964, 978-79 (6th Cir. 2000). The "intentional interference" element requires more than just purposeful or knowing behavior; the plaintiff must also allege that the interference was either (1) a per se wrongful act or (2) a lawful act "done with malice and unjustified in law for purpose of invading the contractual rights or business relationship of another." *Wausau Underwriters Ins. Co. v. Vulcan Development, Inc.*, 323 F.3d 396, 404 (6th Cir. 2003) (quoting *Clark v. West Shore Hospital*, 16 Fed. Appx. 421, 430 (6th Cir. 2001) (internal quotation marks omitted)). The expectancy must be "a

reasonable likelihood or probability, not mere wishful thinking." *Rockwell Medical, Inc. v. Yocum*, 76 F. Supp.3d 636, 648 (E.D. Mich. 2014) (Lawson, J.) (quoting *Cedroni Association, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 492 Mich. 40, 45, 821 N.W.2d 1, 3 (2012)).

Plaintiffs identify "the business operated by Adrish Banerjee and Catherine Yan He in Nevada, Yongming (Steven) Sui in California, and Lujan Shi in Michigan" as customers. (Dkt. # 2, Pg. ID 21.) Neither the complaint nor the briefing are entirely clear, but it appears that Sui owns Trarms' customer ARD Enterprises Inc., in California, and Lujan Shi owns Tuff Zone. Plaintiffs also allege that "Leapers had a meeting with Cheaper than Dirt[,]" a large retail outlet that purchased Trarms products through Tuff Zone, "after which Cheaper [Than Dirt] gave Tuff Zone notice that it would no longer be buying [Trarms'] scopes from Tuff Zone[,]" (*Id.* at Pg. ID 19), and that "Leapers knew of Tuff Zone's relationship with Cheaper Than Dirt and actively, intentionally and tortiously interfered and succeeded in terminating such relationship (*Id.* at Pg. ID 22).

Plaintiffs summarize the basis for their tortious interference claim as follows:

> Leapers and Continental tortiously interfered with Trarms' business relationships or expectancies by wrongfully causing Charlie Shi to be criminally prosecuted and arrested in front of the crowd of customers and potential customers at the SHOT show; by having Trarms' customers (Banerjee, He, Sui and Lujan Shi) arrested and prosecuted; by sending fraudulent and extortionate letters across state lines to Trarms' customers ARD and Tuff Zone; and by bringing a sham civil case against Tuff Zone and otherwise interfering with Tuff Zone's business relationship with its customer Cheaper Than Dirt.

(*Id.*) Defendants contend that Plaintiffs' tortious interference claim fails for two reasons: the amended complaint fails to identify a business relationship or expectancy that was actually terminated as a result of Defendants' conduct, and Plaintiffs do not allege any actual interference with Cheaper Than Dirt. (Dkt. # 4, Pg. ID 49-50.)

As alleged in the amended complaint, the only existing business relationship actually terminated as a result of Defendants' interference was Cheaper Than Dirt's relationship with Tuff Zone. Plaintiffs argue that they were already in the business of selling to Cheaper Than Dirt through Tuff Zone, point to the demand letters sent by Defendants, and argue that "the fruit of those letters is evidenced by Cheaper Than Dirt terminating the use of Trarms products." (Dkt. # 13.)

Setting aside the question of whether Michigan law countenances this sort of "customer of a customer" expectancy—an issue that is far from clear—Plaintiffs do not logically connect the receipt of the demand letter by Tuff Zone to Cheaper Than Dirt's decision to stop purchasing Trarms' products from Tuff Zone. The amended complaint states only that "Leapers had a meeting with Cheaper than Dirt personnel, after which Cheaper [Than Dirt] gave Tuff Zone notice that it would no longer be buying scopes from Tuff Zone." (Dkt. # 2, Pg. ID 19.) But this is not an allegation of a per se wrongful act or a "lawful act done with malice and unjustified in law[,]" *Wausau Underwriters*, 323 F.3d at 404. Standing alone, alleging a meeting, followed by a customer shopping elsewhere, is fallacious *post hoc* reasoning, and insufficient.

However, Plaintiffs also point to the allegedly lost business expectancy from the customers in the crowd at the trade show. (Dkt. # 13, Pg. ID 387.) And Plaintiffs do allege that "[a]s a result of Defendants' tortious interference, Trarms was damaged by substantially decreased sales and revenue." (Dkt. # 2, Pg. ID 22.) Defendants argue that Plaintiffs do not sufficiently plead specific lost expectancies, and that a generalized expectation that someone in the crowd would otherwise be a customer is insufficient, citing a raft of out-of-circuit cases to support the contention that Plaintiff must allege a

specific terminated relationship from a specific third party. (Dkt. # 20, Pg. ID 510-11.) The court disagrees.

*Marks One Car Rental, Inc. v. Auto Club Group Ins. Co.*, 55 F. Supp.3d 977 (E.D. Mich. 2014) (Cohn, J.) is remarkably similar to the instant case. In *Marks One*, the plaintiff alleged that representatives of the defendants "engaged in conduct that would statutorily qualify as defamation per se" by "making direct contact with several of the plaintiffs' customers and asserting fraudulent and defamatory misrepresentations relative to [the plaintiffs'] quality of work product." *Id.* at 985. The defendants also told the plaintiffs' customers that the plaintiffs "engage in fraudulent insurance schemes and the criminal act of forgery." *Id.* The *Marks One* court denied the motion to dismiss and found that Plaintiffs' expectancy of future car-repair and car-rental service business was not dependent on "wishful thinking" but was a "reasonable probability." *Id.* at 986.

Plaintiffs advance specific allegations of per se wrongful conduct aimed at Plaintiffs' existing and potential customers—false arrests, malicious prosecution, defamation both in the allegedly fraudulent letters sent to at least two of Plaintiffs' customers and the staging of Shi's arrest at the trade show, and so on. Plaintiffs have claimed decreased sales resulted from Defendants actions, and, given that harm to reputation is presumed for defamation per se, the court finds that Plaintiffs set out an at least plausible causal relationship. Like the *Marks One* court, this court "is satisfied that the foregoing assertions state a plausible claim that [Defendants] undertook these action to disrupt [P]laintiffs' ongoing and potential business relationships with its

customer base and caused irreparable harm [P]laintiffs' business reputation[,]" *id.*, and did so. Accordingly, the court will deny Defendants motion in this respect.[2]

## B.  Count II: Violations of the Sherman Act, 15 U.S.C. § 1, 2

Plaintiffs bring claims under both § 1 and § 2 of the Sherman Act. (Dkt. # 2, Pg. ID 23-25.) Section 1 prohibits "[e]very contract, communication . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. As nearly every contract amounts to some "restraint of trade," the Supreme Court has limited § 1 to bar only "unreasonable restraints." *See Nat'l Collegiate Athletic Ass'n v. Bod. Of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). "To prevail on a claim under § 1, a plaintiff must prove: (1) a contract, combination, or conspiracy; (2) producing adverse, anticompetitive effects in the relevant market; and (3) resulting in injury." *Medical Center at Elisabeth Place, LLC v. Atrium Health System*, 817 F.3d 934, 939 (6th Cir. 2016) (citing *Expert Masonry, Inc. v. Boone Cty. Ky.*, 440 F.3d 336, 342 (6th Cir. 2006)).

Section 2 renders liable "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or person, to monopolize any part of the trade or commerce . . . ." 15 U.S.C. § 2. "A claim under § 2 requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or us of that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'" *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290

---

[2] "Michigan courts are split on the issue of whether a tortious interference claim can stand if the tortious interference is incidental to a defamation claim." *Marks One*, 55 F.Supp.3d at 985 (citing *Meyer v. Hubbell*, 117 Mich. App. 699, 709-11, 324 N.W.2d 139 (1982)). Neither party raises this issue, however, and whether the tortious interference claim is subsumed within the defamation claim for the purposes of damages remains an open question that the court need not address at this time.

F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985)).

Plaintiffs base their Sherman Act claims on the allegations that Defendants "instigated and engaged in activity that led to the wrongful arrest and prosecution of Plaintiff Shi, drafted fraudulent and extortionate letters threatening criminal and civil prosecution to Trarms' customers, and directly interfered with Tuff Zone's business relationship with Cheaper Than Dirt." (Dkt. # 13, Pg. ID 393.) Defendants contend that Plaintiffs' antitrust claims fail for a variety of reasons. The court concludes that Plaintiffs cannot maintain a claim under § 1 because Leapers and Continental are not competitors and that Plaintiffs have not sufficiently alleged monopoly power. Accordingly, the court will grant Defendants' motion with respect to the antitrust claims.

### 1. Defendants Are Not Competitors

In order to have a § 1 violation, there must be an agreement—§ 1 does not encompass unilateral conduct, no matter how anticompetitive. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999) (citing *Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605, 611 (6th Cir.1990)). Defendants argue that § 1 only applies to concerted action among competitors. (Dkt. # 4, Pg. ID 53.) Here, it is undisputed that Leapers and Continental are not competitors—Continental was acting as Leapers' agent.

As a general rule, "a corporation cannot ordinarily conspire with its agents or employees." *Nurse Midwifery*, 918 F.3d at 612 (finding that defendant hospital's staff could not conspire with the hospital itself); *see also Podiatric Physicians & Surgeons*, 185 F.3d at 620-21 (finding podiatric surgeon board did not compete, and so could not

conspire, with its members). This is part of the "intracorporate conspiracy doctrine"—as is the principle that agreements between officers or employees of the same firm do not fall within § 1. *See Nurse Midwifery*, 918 F.3d at 612; *Podiatric Physicians & Surgeons,* 185 F.3d at 620 ("Section 1 of the Sherman Act is concerned only with concerted action among competitors and not the coordinated activities that occur within a single firm." (internal quotation marks omitted)). Similarly, under the intra-enterprise rule, a parent corporation and its wholly owned subsidiary are viewed as a single enterprise for the purposes of § 1. *Nurse Midwifery*, 918 F.3d at 612.

Plaintiffs rely on the "independent personal stake" exception to the general rule that a principal cannot conspire with one of its agents. (*See* Dkt. # 13, Pg. ID 395 (citing *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir. 1983), *cert. denied*, 464 U.S. 937).) But the Sixth Circuit has explicitly declined to adopt the independent personal stake exception. *See Podiatric Physicians & Surgeons*, 185 F.3d at 621 n.8 (citing *Nurse Midwifery.* 918 F.2d at 611). Plaintiffs also point to *Ozdoba v. Verney Brunswick Mills Inc.*, 152 F. Supp. 136, 138 (S.D.N.Y. 1946) for the proposition that "noncompetitors or members of an affiliated group may conspire illegally to restrain the interstate commerce of others and thereby subject themselves to the prohibitions of the anti-trust laws." *Id.* (citations omitted). Plaintiffs do not explain, however, how this out-of-circuit district court case trumps the Sixth Circuit precedent holding that a corporation cannot conspire with its agent within the meaning of § 1. *See Nurse Midwifery*, 918 F.2d at 611.

The court finds that Plaintiffs fail to state a claim under § 1 of the Sherman Antitrust Act because Leapers cannot "conspire" with Continental, its agent. As a result, Defendants' motion must be granted with respect to the § 1 claims.

## 2. Market Strength

Attempted monopolization under 15 U.S.C. § 2 "occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are to build a monopoly or exclude or destroy competition." *Conwood Co. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (internal quotation marks omitted). [T]he plaintiff must prove a specific intent to destroy competition or build a monopoly." *Id.* (internal quotation omitted). "Market strength that approaches monopoly power (the ability to control prices and exclude competition) is a necessary element for showing a dangerous probability of achieving monopoly power." *Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 326 Fed. Appx. 892, 899 (6th Cir. 2009). "The analysis in this regard requires that the court focus on the ability of a single seller to unilaterally raise prices and restrict output." *Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*, 219 Fed. Appx. 398, 409 (6th Cir. 2007) (*citing Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993)).

Plaintiffs define the relevant market as "the market for the sale to distributors of 'low end' or mass market/lower priced rifle scopes and related products." (Dkt. # 2, Pg. ID 23.) As to Leapers' market power, the amended complaint states only, "On information and belief, Leapers is 'undoubtedly' the market leader in rifle scopes[,]" (*id.*), and that Leapers' principal owner has testified that Leapers "has a very prominent place in the [market] segment that we focus on." (*Id.* at Pg. ID 7.) Defendants contend that this fails to plead a dangerous probability that Leapers will achieve monopoly power. (Dkt. # 4, Pg. ID 58-59.) The court agrees.

First, being the "leader" in the market or having a "very prominent place" does not suggest "a dangerous probability of achieving monopoly power." *Partner & Partner*, 326 Fed. Appx. at 899. Second, review of Ding's deposition transcript shows that she was referring to Leapers' recognition by customers, not its market share, when referring to it has having a "very prominent place." (Dkt. # 4-2.) This leaves the only factual allegation regarding Leapers market power as the assertion that it is "undoubtedly the leader" made "on information and belief." (Dkt. # 2, Pg. ID 23.) The court has no difficulty finding that this is insufficient.

## C. Count III: Defamation

Plaintiffs base their defamation claim on their allegations that Defendants "falsely communicated to third parties, including Tuff Zone and ARD, that Plaintiff Trarms had committed a crime," and that they "caus[ed] [Plaintiff] Shi to be arrested at the trade show in the view of customers [implying he] committed a crime." (Dkt. # 2, Pg. ID 26.)

There are essentially three categories of allegedly defamatory statements complained of, involving four different states: the letters to customers in Michigan and California, the statements to law enforcement in Indiana, and the arrest in Nevada. Defendants aver that the law is not materially different across these jurisdictions, (Dkt. # 4, Pg. ID 60 n.6). In most respects, this is true. Accordingly, where there is no apparent conflict, the court will apply Michigan law.[3] However, Michigan and Indiana law do conflict on whether statements made to law enforcement to report a crime or regarding an ongoing investigation are protected by an absolute privilege or merely a qualified one. (*See* Dkt. # 22.) The court addresses this issue in the relevant section.

---

[3] Application of Michigan law in this manner is consistent with the parties' briefs, which primarily point to Michigan cases.

The basic elements of defamation are (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Hope-Jackson v. Washington*, 311 Mich. App. 602, 620, 877 N.W.2d 736 (2015) (citation omitted). "At common law, words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Burden v. Elias Bros. Big Boy Restaurants*, 240 Mich. App. 723, 727–28, 613 N.W.2d 378, 381 (2000) (citing *Sias v. General Motors Corp.,* 372 Mich. 542, 551, 127 N.W.2d 357 (1964)). Here, Plaintiffs allege that Defendants falsely indicated that Plaintiffs were counterfeiting Defendants' scopes or, more generally, had committed a crime—Plaintiffs allege defamation per se. *See Id.*

### 1. Statute of Limitations

Defendants first contend that the defamation claim is barred by the applicable statute of limitations. (Dkt. # 4, Pg. ID 60.) The statute of limitations for defamation is one year in Michigan, Mich. Comp. Laws § 600.5805(9), and California, Code Civ. Proc. § 340, Subd. (c), and two years in Indiana, Ind. Code § 34-1-2-2(1), and Nevada, NRS 11.190(4). The arrest was made and the letters were sent in early 2014.[4]

Federal Rule of Civil Procedure 15(c) provides that an amendment to a pleading relates back to the date of the original pleading when the claim asserted in the amended

---

[4] Although the amended complaint states that the letter to ARD was sent in March 2015, Defendants' brief explains that it was actually March 2014, as the letter was attached as an exhibit to the counterclaims when they were initially filed. (Dkt. # 4, Pg. ID 60.) Plaintiffs do not dispute Defendants' characterization, and the court will credit it.

pleading "arose out of the conduct, transaction, or occurrence set out—or attempted to be set forth in the original pleading[.]" Fed. R. Civ. P. 15(c)(2)(B). Plaintiffs set out the same facts in their original counterclaim, to which the letters were attached, filed on December 31, 2014. *See* Original Civil Action, Dkt. # 43. The defamation claim unmistakably arises out of the same conduct, transaction, or occurrence originally set out in the counterclaims, and so relate back to that date under Fed. R. Civ. P. 15(2)(B). As a result, the defamation claim is timely.

## 2. The Arrest

Defamatory statements include not only words, but also actions. *K-Mart Corp. v. Washington*, 109 Nev. 1180, 866 P.2d 274 (1993), *receded from on other grounds by Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277 (2005).) In *K-Mart*, the plaintiff had his hair done in a "Jeri Curl" for New Year's Eve and visited a Las Vegas K-Mart immediately after, with his hair still "dripping wet." *Id.* at 277. The defendants, an off-duty police officer and the K-Mart loss-prevention agent, mistakenly believed the plaintiff had shoplifted hair product from the store, and decided to confront him. *Id.* An altercation ensued, and defendants chased the plaintiff through the store to the parking lot, tackled him, handcuffed him, and led him through the store to the security office, all in front of a crowd. *Id.* The Nevada Supreme Court found that "the act of being handcuffed and marched through the store to the K-Mart security office . . . constitute[d] slander per se. *Id.* at 282; *accord Tumbarella v. Kroger Co.*, 85 Mich. App. 482, 493, 271 N.W.2d 284, 289 (1978) (finding defamation by "dramatic pantomime" where security guards approached cashier, asked "where's the money?" and escorted her to the store's

backroom) (citing *Bonkowski v. Arlan's Department Store*, 383 Mich. 90, 96-97, 174 N.W.2d 765 (1970)).

Relying on *K-Mart*, Plaintiffs argue that Defendants defamed Shi through causing his public arrest. (Dkt. # 13, Pg. ID 402-03.) Defendants argue that, even if the arrest could be construed as a defamatory statement, the arrest "was by police, not Defendants. Plaintiffs' case citations do not support he novel concept of 'contributory implied defamation.'" (Dkt. # 20, Pg. ID 515.)

While Plaintiffs plead facts suggesting that Defendants staged Shi's public arrest and "perp walk," the amended complaint specifically states that "[t]he police physically detained and removed Mr. Shi from the trade show." (Dkt. # 2, Pg. ID 17.) Nothing in the complaint suggests that Brad Harper, or any other Continental employee, was directly involved in the apprehension. In contrast, the loss-prevention agent in *K-Mart* was heavily involved in actually effecting the arrest, including assisting in tackling and handcuffing the defendant. *K-Mart*, 114 P.3d at 277. Defendants are correct that Plaintiffs cite no cases supporting the idea that causing someone else to utter a defamatory statement or act constitutes defamation.

The court finds that, in this respect, the complaint has not alleged sufficiently detailed facts to state a claim under *Twombly*, 550 U.S. at 570. Accordingly, the court will dismiss this particular claim without prejudice.

### 3. Privilege and Choice of Law

Whether Plaintiffs state a claim for defamation with respect to Defendants statements to Indiana law enforcement turns on whether Michigan or Indiana law governs the question. Under Michigan law, statements made to law enforcement to

report a crime or during an ongoing investigation are protected by an absolute privilege. *See Eddington v. Torrez*, 311 Mich. App. 198, 203, 874 N.W.2d 394 (2015) (per curiam) ("The simple fact is that *Shinglemeyer* [*v. Wright*, 124 Mich. 230, 82 N.W.887 (1900)] created an absolute privilege that arises in the context of a defamation claim and covers any report of criminal activity to law enforcement personnel, and *Shinglemeyer* remains the law.). On the other hand, Indiana applies only a qualified privilege. *See Hartman v. Keri*, 883 N.E.2d 774, 778 (Ind. 2008) ("Citizens reporting suspected criminal activity to law enforcement enjoy only a qualified privilege, which subjects them to the risk of retaliatory civil litigation for malicious or unfounded charges.") (citations omitted). The court asked the parties to address this conflict at the May 3 hearing. (*See* Dkt. # 22.)

In federal question cases, a district court entertaining pendent state claims applies the choice of law rules of the forum state. *Glennon v. Dean Witter Reynolds, Inc.* 83 F.3d 132, 136 (1996). Under Michigan choice of law rules, Michigan law governs unless a "rational reason" to apply the law of another state exists. *Sutherland v. Kennington Truck Service, Ltd.*, 454 Mich. 274, 562 N.W.2d 466, 471 (1997). To determine whether a "rational reason" to apply the law of a foreign state exists, Michigan courts apply a two-step process. *Id.* First, the court must determine "if any foreign state has an interest in having its law applied." *Id.* If so, the court must then determine if Michigan's interests mandate that Michigan law be applied despite the foreign interest. *Id.*

At the hearing and in a supplemental brief (Dkt. # 23), Defendants argued that the only other state that could be said to have an interest is California, because

Plaintiffs are California citizens.[5] (*See* Dkt. # 23, Pg. ID 622.) But with respect to the statements to law enforcement, the only connection to California is that Plaintiffs are California citizens. This, without more, is insufficient to support the choice of California law. *See Sutherland*, 454 Mich. at 287 (citing *Home Ins. Co. v. Dick*, 281 U.S. 397, 408 (1930) and *Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178 (1936)).

Under *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987), "the state in which the injury takes place . . . always has an interest in conduct within its borders, whether or not its citizens are involved. *Id.* at 28. However, the *Olmstead* court also found that a Michigan statutory provision capping recoverable damages at $ 25,000 did not relate to conduct. *Id.* ("Limitations of damages for wrongful death . . . . are concerned not with how people should behave but with how survivors should be compensated. The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there.") (quoting *Reich v. Purcell*, 67 Cal. 2d 551, 556, 432P.2dc 727 (1967)). As a result, the court concluded that Wisconsin, the state in which the underlying car crash occurred but where neither party resided, had no interest in having its having its law, which did not cap damages, applied. *Id.*

Here, the statements to law enforcement were uttered in Indiana. As the statements are per se defamatory, damage to reputation is implied. Consequently, as the individuals who received these allegedly defamatory statements were in Indiana, the per se injury took place in Indiana. Continental is located in Indiana and a party to the case. Accordingly, under *Olmstead*, Indiana has an interest in applying its law as well. *Id.*

---

[5] California also applies an absolute privilege. *See* Cal. Civil Code § 47(b).

Having determined that Indiana has an interest in having its law applied, the court must determine whether Michigan's interests mandate that Michigan law be applied despite the foreign interest. *Sutherland*, 454 Mich. at 562. Neither party has provided cases that discuss in depth the sort of interests the court is supposed to weigh. *Sutherland* does not delve into what constitutes an interest or how the interests are to be weighed—it finds that the choice of law rules of the foreign state would apply Michigan law, and so the foreign state had no interest. *Id.* at 289-90. At least one court has held that Michigan "had no real interest" in applying its law on trespass where the trespass occurred in New Jersey, by New Jersey and Pennsylvania citizens, and the only connections to Michigan were that the plaintiffs were Michigan corporations and Michigan was the forum state. *See LL NJ, Inc. v. NBC-Subsidiary (WCAU-TV), L.P.*, 2008 WL 1923261 (E.D. Mich. April 28, 2008) (Lawson, J.).

In another case involving a conflict between absolute and qualified privileges grounded in First Amendment concerns, the court held that New York's absolute "reporter's privilege" and not Michigan's qualified privilege governed discovery disputes in that Eastern District of Michigan proceeding. *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124, 133 (E.D. Mich. 2004) (Feikens, J.). In *Compuware*, the court described New York as having a "very strong interest in having its law applied, since the materials in question were given by two New York companies to defendant Moody's, also a New York company." *Id.* The court went on to discuss how foreign courts declining to apply New York's law would defeat its desired effect of encouraging access to information by newsgatherers. *Id.* In comparison, the court concluded that Michigan "had only a very slight interest in having its law applied"

because "Michigan's only connection to the documents in question is Plaintiff's discovery request." *Id.*

Defendants contend that Michigan has a substantial interest in effecting its public policy determination that "the right to speak freely when reporting a perceived crime or assisting with an investigation should be protected." (Dkt. # 23, Pg. ID 623.) But Defendants point to no cases articulating that interest, the strength of that interest, nor how it is to be weighed against other states' interests when those states' public policy determinations have led them to adopt less protective rules.

According to the allegations, Leapers hired an Indiana private investigation firm who ordered scopes to be delivered to Indiana in order to engineer Indiana jurisdiction and initiate criminal proceedings under a unique Indiana criminal statute. (*See* Dkt. # 2.) To the extent that Michigan has an interest in effecting its public policy choice, the connections to Indiana alone make Indiana's public policy choice to discourage malicious false reports at least as weighty an interest as Michigan's, if not more so. The strength of Michigan's interest necessarily wanes as the connection to Michigan becomes more remote—and Indiana's interest grows comparatively stronger. *See LL NJ, Inc.*, 2008 WL 1923261; *Compuware*, 222 F.R.D. at 133.

Though Continental acted as an agent of Leapers, the court sees no reason why Indiana's interest in regulating false reports to its police would be lessened where the reporter is a foreign citizen. If anything, Indiana has a greater interest in preventing foreign citizens from commandeering its law enforcement to harass other foreign citizens, thereby wasting Indiana's resources and tarnishing the reputation of its law enforcement officers.

Further, it should not be ignored that Defendants chose Indiana. Leapers did not declare itself to be the victim of a crime *in Indiana* by happenstance—as Defendants acknowledge in their motion to transfer, Leapers sought out Indiana to take advantage of its laws and law enforcement and subsequently brought suit on the federal claims in this court, compelling Plaintiffs to bring their counterclaims in this forum. (Dkt. # 5, Pg. ID 139 (describing these claims as "compulsory counterclaims" and arguing that "Plaintiffs did not really choose the forum, the forum chose them").) "[T]he importance of discouraging forum-shopping is a legitimate factor in the interest-weighing analysis under Michigan law." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 699 (6th Cir. 2013). The interest in discouraging forum-shopping weighs against applying Michigan law and in favor of Indiana law. Further, as Defendants went to such lengths to secure Indiana jurisdiction, application of Indiana law in this respect cannot be said to be unpredictable or defeat the parties' reasonable expectations, which is also a factor to be considered. *Id.*

For these reasons, the court concludes that Michigan's interests do not mandate application of Michigan law in place of Indiana law. *Sutherland*, 454 Mich. at 562. Indiana's interest in regulating false reports to its police regarding its statutes, combined with the reasonable expectations of the parties and the need to discourage forum shopping, substantially outweigh Michigan's interest in encouraging its citizens to report suspected crimes in foreign states. Accordingly, the court will apply Indiana's qualified privilege.

The Indiana Supreme Court has recently explained—at length—the qualified privilege doctrine in the context of statements to the police:

A qualified privilege "applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he had a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco,* 600 N.E.2d 1353, 1356 (Ind.1992) (internal quotation marks omitted). As a defense to defamation, the qualified privilege operates not to "change the actionable quality of the words published, but merely [to] rebut[ ] the inference of malice that is [otherwise] imputed." *Holcomb v. Walter's Dimmick Petroleum, Inc.,* 858 N.E.2d 103, 106 (Ind. 2006) (internal quotation marks omitted). To merit its protection, "[t]he burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words." *Bals,* 600 N.E.2d at 1356. Then "the plaintiff ... has the burden of overcoming that privilege by showing that it has been abused." *Id.* When speaking of abuse, "the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists." *Holcomb,* 858 N.E.2d at 106–07 (internal quotation marks omitted). And "[u]nless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury." *Kelley v. Tanoos,* 865 N.E.2d 593, 601 (Ind.2007).

*Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009). In the particular context of statements to the police, the *Williams* court explained:

A citizen who reports wrongdoing to police knowing that the information is faulty fails to earn protection against a later civil action. But merely arguing about what the speaker should have known is insufficient to show that the speaker made a statement "without belief . . . in its truth." *Bals,* 600 N.E.2d at 1356. As for applying the "no grounds for belief" language to this situation, *Bals* is best understood as implicitly recognizing that the absence of any discernable [sic] basis for the truth of the matter—that something is so obviously mistaken—can serve as circumstantial evidence of a reporting citizen's actual knowledge of falsity.

*Williams*, 914 N.E.2d at 766.

The court finds that Plaintiffs have alleged that Continental's statements to Indiana investigators were false and that Defendants made those statements "without belief . . . in [their] truth" within the meaning of *Williams*. 914 N.E.2d at 766. Accordingly, the court will deny Defendants' motion in this respect.

## 4. Particularity

In Michigan, "[a] plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Ghanam v. Does*, 303 Mich. App. 522, 543, 845 N.W.2d 128, 142 (2014). Defendants argue that Plaintiffs have not pled the particular defamatory words complained of with sufficient specificity. (Dkt. # 4, Pg. ID 60-61.)  Here, Plaintiffs point to the letters sent to ARD and Tuff Zone.[6] The letters contain serial numbers of Trarms' products and claim that Leapers owns propriety rights in those products, thereby implying that Trarms' products were counterfeit and, by extension, that Shi had committed a crime. (Dkt. # 2, Pg. ID 19, 26.) The court is satisfied that the defamation claim is pled with sufficient particularity to give Defendants notice of the statements claimed to have been defamatory.

With respect to the statements made to the police, the defamatory statement is that Shi was engaged in counterfeiting Leapers' scopes. The court is similarly satisfied that this provides Defendants with sufficient notice.

### D. Count IV: False Light

The parties point to Michigan law for the false light claims as well. False light invasion of privacy requires a communication broadcast to the public in general or publicized to a large number of people which places the injured party in a light which would be highly offensive to a reasonable person. *Early Detection Center, P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 630 (1986). The amended complaint sets out

---

[6] The letters are attached to Defendants' motion (Dkt. # 4-3), referenced in the complaint, and were attached to the original counterclaims, so the court may consider them. *See Erie County*, 702 F.3d at 863.

two bases for the false light claim: Leapers' demand letters to Trarms' customers "with false statements indicating Trarms' President [Plaintiff Shi] had committed a crime," and "causing [Plaintiff] Charlie Shi to be arrested . . . [which in turn implied] that he had committed a crime." (Dkt. # 2, Pg. ID 27.)

Defendants first contend that sending demand letters to two customers is insufficient to count as "publicity" within the meaning of Michigan's false light invasion of privacy tort. (Dkt.# 4, Pg. ID 64-65; Dkt. # 20, Pg. ID 515.) Unlike the "publishing" element of defamation, "publicity" for a false light invasion of privacy claim is limited to situations in which the communication is "broadcast to the public in general or publicized to a large number of people." *Ledl v. Quick Pik Food Stores, Inc.*, 133 Mich. App. 583, 591-92, 349 N.W.2d 529 (1984) (quoting *Reed v. Ponton*, 15 Mich. App. 423, 426; 166 N.W.2d 629 (1968)). Defendants point to *Sawibini v. Desenberg*, 143 Mich. App. 373, 372 N.W.2d 559 (1985), which found that a letter sent to eleven recipients alleged only an "extremely limited audience" insufficient to meet the publicity requirement for a false light invasion of privacy claim. *Id.* at 565.

Plaintiffs contend that the letters "were purposeful and sent with the intent to destroy Plaintiffs' business" and, as a result, "[t]hese letters alone are sufficient to satisfy the requirement for public broadcasting." (Dkt. # 13, Pg. ID 405) Plaintiffs go on to complain about the alleged falsity of the statements contained in the letters and Defendants' intent. (*Id.* at Pg. ID 405-06.) But Plaintiffs provide no authority for the proposition that Defendants' conduct being especially objectionable obviates the publicity requirement. Plaintiffs cannot cram their defamation-shaped peg into a false light-shaped hole. The claims are distinct. *See Ledl*, 133 Mich. App. at 591-92.

Defendants' statements to the police are not susceptible to a false light claim for the same reason, regardless of their alleged falsity. Therefore, the court will grant Defendants' motion with respect to these portions of the false light claim.

As to the arrest itself, Defendants argue that Shi's arrest was not a "communication" and, even if it were, "Leapers did not utter it—law enforcement did." (Dkt. # 4, Pg. ID 64.) As with the defamation claim relating to the actual arrest, the pleadings are not sufficient to determine to what degree Harper, or any other agent of Defendants, acted—for instance, whether they were involved in actually effectuating the arrest. Defendants also contend that the amended complaint does not allege facts from which the court could determine if a sufficiently large number of people witnessed the arrest to satisfy the publicity element. (*Id.* at Pg. ID 65.) The court agrees. Accordingly, the court will dismiss this aspect of the false light claim without prejudice under *Twombly*, 550 U.S. at 570.

### E. Count V: Abuse of Process

Both parties point to Indiana law for the abuse of process claim. In Indiana, abuse of process has two elements: (1) "an ulterior purpose" and (2) "a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *Reichhart v. City of New Haven*, 674 N.E.2d 27, 30 (Ind. Ct. App. 1996) (citation omitted). Abuse of process "requires a finding of misuse or misapplication of process, for an end other than that which it was designed to accomplish." *Id.* Abuse of process is similar to, though distinct from, malicious prosecution—"[i]f the defendant prosecutes an innocent plaintiff for a crime without reasonable grounds to believe him guilty, it is malicious

prosecution; if he prosecutes with such grounds to extort payment of a debt, it is abuse of process." *Id.* at 31.

Defendants contend that the abuse of process claim fails because "Plaintiffs do not allege that Defendants themselves engaged in the improper use of 'process.'" (Dkt. # 4, Pg. ID 66.) Essentially, Defendants argue that law enforcement, not Defendants, caused and carried out the arrest and prosecution. (*Id.*) The court discusses this argument with respect to the malicious prosecution claim, *infra*, and rejects it for the same reasons here.

Defendants also claim that Plaintiffs "make passing reference to the civil suits Leapers filed in Michigan and Indiana, but make no allegation that these were put to any use other than their proper, inherent function of stating civil causes of action." (*Id.* (record citation omitted).) But Defendants have alleged that these actions were filed despite Defendants' knowledge that their claims were unsupportable and with the intent to drive Plaintiffs from the market for low cost, mass-market rifle scopes by targeting Plaintiffs and their customers. (Dkt. # 2, Pg. ID 17.) It may be that Plaintiffs will be unable to prove facts to support these allegations, but at this point the allegations suffice to state an "ulterior purpose" and a "use of the legal process not proper in the regular conduct of the proceeding." *New Haven*, 674 N.E.2d at 30.

### F. Count VI: False Arrest and Imprisonment

The amended complaint alleges that Continental employee Brad Harper, using an alias, arranged to meet Shi at the trade show and approached him with "seven or eight police officers[.]" (Dkt. # 2, Pg. ID 16-17 (emphasis removed).) It goes on to state that "[t]he police physically detained and removed Mr. Shi from the trade show." (*Id.* at

Pg. ID 17.) As with the defamation and false light claims, the court is unable to ascertain from the pleadings how involved Harper was in actually effectuating the arrest. Accordingly, the court will dismiss this count without prejudice as well.

### G. Count VII: Malicious Prosecution

Plaintiffs apparently base their malicious prosecution claim not only on the criminal prosecution of Shi, but also on the civil lawsuits, alleging that "Defendants instituted sham litigation in Indiana as well as Michigan." (Dkt. # 13, Pg. ID 409 n.3.) Defendants move to dismiss this claim only with respect to the criminal prosecution of Shi. (*See* Dkt. # 4, Pg. ID 68 ("This allegation pertains only to Shi's criminal prosecution.").)

To establish malicious prosecution under Indiana law, Plaintiffs must show: (1) the defendant instituted or caused to be instituted a prosecution of the plaintiff; (2) the defendant acted with malice; (3) the defendant had no probable cause for instituting the prosecution; and (4) the prosecution was terminated in the plaintiff's favor. *Stivers v. Old National Bank*, 148 Ind. App. 196, 200, 264 N.E.2d 339 (1970). "[A] judicial determination of probable cause in a criminal proceeding [is] prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Ali v. Alliance Home Health Care*, 53 N.E.3d 420, 432 (Ind. Ct. App. 2016) (quoting *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004)). The plaintiff may overcome such a prima facie showing of probable cause only by demonstrating that it was induced by false testimony, fraud, or other improper means. *Id.*

Defendants argue that they did not "institute or cause to be instituted" the prosecution of Shi and that "the Indiana court's determination of probable cause . . .

undercuts Plaintiffs' claim as a matter of law." (Dkt. # 4, Pg. ID 68-69.) Specifically, Defendants contend that Plaintiffs allege only "a special relationship between Continental and the authorities, but add no factual substance to this meaningless and pejorative term." (*Id.* at Pg. ID 68.)

The amended complaint alleges that "Continental[] knew . . . that if it provided false evidence, Mr. Shi would be prosecuted[] without any independent investigation by the Indiana police or prosecutor." (Dkt. # 2, Pg. ID 31.) It goes on to aver "Continental and [Prosecutor Malcolm] Gwinn were in almost constant contact concerning Mr. Shi and Trarms' customers, and that Gwinn requested, and received from Continental, legal opinions and advice on prosecuting Mr. Shi and others." (Dkt. # 2, Pg. ID 31.)

Defendants argue that Plaintiffs must plausibly allege that Defendants "had any ability to influence, command, or force the prosecutor to institute charges against Shi[,]" but cite no authority for that proposition. (Dkt. # 4, Pg. ID 68.) Plaintiffs have alleged an unusually high degree of coordination between Defendants and the police and prosecutors, that Defendants provided false evidence safe in the knowledge that no independent investigation would take place, that Defendants intentionally manufactured jurisdiction for this particular prosecutors' office, and a "special relationship" between Continental and the prosecutor. The court is satisfied that this is sufficient to plausibly allege that Defendants "had any ability to influence" the prosecutor to institute charges. (Dkt. # 4, Pg. ID 68.)

Defendants' contention that the Indiana court's determination of probable cause defeats Plaintiffs' claim absent an allegation that Defendants controlled the court (Dkt. # 4, Pg. ID 69) is misguided. A warrant is a prima facie showing of probable cause, *Ali*, 53

N.E.3d at 432, but this may be overcome by showing that the determination of probable cause was induced by false testimony, fraud, or other improper means. *Id.* The amended complaint alleges that Plaintiffs told the police and prosecutor they had proprietary rights in the grip design on the scopes while knowing that they in fact could not claim any such ownership rights, that no independent investigation was done, and that the warrant was obtained at least in part through a false affidavit submitted by Continental. (Dkt. # 2, Pg. ID 13.) These allegations suffice to rebut the presumption. Accordingly, Defendants' motion will be denied with respect to Count VII.

### H. Count VIII: 42 U.S.C. § 1983

Plaintiffs' § 1983 claim is similarly based on the arrest and prosecution of Shi. "To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege a violation of a right secured by the federal Constitution or laws and must show that he violation was committed by a person acting under color of state law." *Wershe v. Combs*, 763 F.3d 500, 504-05 (6th Cir. 2014). The Sixth Circuit has provided three "tests" to determine whether private parties acted "under color of state law" for the purposes of liability under § 1983: (1) the public function test; (2) the state compulsion test; and (3) the nexus test. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003). Plaintiffs do not explicitly address any particular test, but their contentions that Defendants and law enforcement were "inextricably intertwined" imply that, of the three, Plaintiffs target the nexus test.

The nexus test, also called the "symbiotic relationship" test, requires that the state "so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).

Defendants point to a litany of cases for the proposition that reporting an alleged crime and providing information to the police, even if it is false, is not enough to show a conspiracy to violate an individual's constitutional rights. (*See* Dkt. # 4, Pg. ID 72.) Specifically, Defendants point to *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009); *Gardner v. Bisceglia*, 956 F.2d 1164 (6th Cir. 1992); and *Benadivdez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983). Defendants contend that the allegations show only that "Defendants worked hard to investigate claims in which they strongly believed, and law enforcement shared the legal conclusions Defendants drew from the evidence." (Dkt. # 4, Pg. ID 73.) Further, they assert that any record of communications with the prosecutor merely show that "Defendants complied with requests for information and deferred to the government's judgment regarding how best to build its case, without usurping the authority of the state officials entrusted with the duty to pursue and prosecute Leapers' claims." (*Id.*)

Plaintiffs argue that Defendants' actions are much more than providing information, even false information, to the police. (Dkt. # 13, Pg. ID 412.) Specifically, Plaintiffs accuse Continental of "entrapping" Shi by causing Trarms' scopes to be sent to a gun shop in Indiana to secure jurisdiction for a prosecutor with whom Continental had a "special relationship" and a unique criminal statute. Leapers then sent correspondence to the Evansville police and prosecutor falsely claiming that Plaintiffs were counterfeiting their scopes. Continental and Leapers allegedly continuously supplied false information knowing that it would not be independently investigated, and supplied a warrant affidavit making false claims that resulted in Shi's arrest and prosecution without probable cause. Plaintiffs allegedly directed the location and timing

36

of the arrest, staging it to maximize the embarrassment Shi in front of customers and potential customers, and participated in the arrest itself. Throughout this time, Leapers provided legal advice and remained in near constant contact with the prosecutor's office. (Dkt. # 13, Pg. ID 412.)

Taking Plaintiffs' allegations as true and construing all reasonable inferences in their favor, as the court is required to do, Defendants did far more than merely provide information to the police or vigorously investigate conduct they believed to be unlawful. At this stage, the court finds that Plaintiffs have set out a plausible claim under 42 U.S.C. § 1983. Accordingly, the court will deny Defendants' motion in this respect.

## IV. CONCLUSION

IT IS ORDERED that Defendants' motion to transfer (Dkt. # 5) is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss (Dkt. # 4) is GRANTED IN PART and DENIED IN PART. The motion is resolved as follows:

- **Count I** (tortious interference): The motion is DENIED.

- **Count II** (Sherman Act): The motion is GRANTED. Plaintiffs' claims under 15 U.S.C. § 1 are DISMISSED WITH PREJUDICE. Plaintiffs' claims under 15 U.S.C. § 2 are DISMISSED WITHOUT PREJUDICE.

- **Count III** (defamation): The motion is GRANTED IN PART. Plaintiffs' claim for defamation by pantomime stemming from the arrest of Plaintiff Shi is DISMISSED WITHOUT PREJUDICE.

- **Count IV** (false light): The motion is GRANTED. With respect to the letters and statements to law enforcement, the claim is DISMISSED WITH PREJUDICE. With respect to the arrest, the claim is DISMISSED WITHOUT PREJUDICE.

- **Count V** (abuse of process) the motion is DENIED.

- **Count VI** (false imprisonment): The motion is GRANTED. Count VI is DISMISSED WITHOUT PREJUDICE.

- **Count VII** (malicious prosecution): The motion is DENIED.

- **Count VIII** (42 U.S.C. § 1983): The motion is DENIED.

  IT IS FURTHER ORDERED that Plaintiffs may address the above-identified

deficiencies in their pleadings by filing a Second Amended Complaint no later than

**three weeks from the date of entry of this order.**


                                        s/Robert H. Cleland                    /
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE
Dated:  May 10, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, May 10, 2017, by electronic and/or ordinary mail.


                                        s/Lisa Wagner                          /
                                        Case Manager and Deputy Clerk
                                        (313) 234-5522